**INDIANAPOLIS & SOUTHEASTERN TRAILWAYS, INC., and James D. Wallace, Appellants,**

**v.**

**Marie BLANKENSHIP and William Donald Queen, Appellees.**

**INDIANAPOLIS & SOUTHEASTERN TRAILWAYS, INC., and James D. Wallace, Appellants,**

**v.**

**Marie BLANKENSHIP, Gdn. of Roger Lee Blankenship, and William Donald Queen, Appellees.**

Court of Appeals of Kentucky.

March 14, 1969.

Rehearing Denied Sept. 26, 1969.

Roy E. Tooms, Jr., Brown, Tooms & Helton, London, for appellants.

Robert L. Milby, Hamm, Taylor & Milby, London, F. Graham Bartlett, Knoxville, Tenn., for appellees.

PALMORE, Judge.

Marie Blankenship and her 15-year-old son, Roger Lee Blankenship, were injured when the bus in which they were riding as fare-paying passengers collided with an automobile operated by William Donald Queen. Their suit against the two drivers and the bus company resulted in a verdict and judgment awarding Mrs. Blankenship $30,000 against Queen and $25,000 against the bus company and its driver and awarding Roger Lee Blankenship $1,000 against Queen and $1,000 against the bus company and its driver. Queen never answered, appeared or testified and does not appeal. The bus company and its driver appeal, contending they were entitled to a directed verdict or judgment n. o. v. and that the amount of the verdict in favor of Mrs. Blankenship was excessive.

The accident happened on U.S. Highway 25 about six miles south of London at about 2:30 A.M. on a clear, dry night in July of 1965. The bus was headed north and the Blankenships were on their way from La Follette, Tennessee, to Cincinnati. The road was an undivided two-lane pavement, one lane for traffic moving in each direction, and was straight for some distance both ways from the scene of the collision. There was no traffic in the immediate area except for the two vehicles involved.

■ Queen's negligence was the principal cause of the accident. The appellants contend it was the sole cause. The sufficiency of the evidence to support the jury's conclusion that the bus driver also was negligent must be weighed on the basis of the principle that a common carrier owes its passengers a higher degree of care than does the operator of a private vehicle. Adams v. Louisville Taxicab & Transfer Co., 307 Ky. 405, 211 S.W.2d 397, 399 (1948). The focus of the inquiry is provided by the Blankenships' contention that the evidence raised a permissible inference that the bus driver should have taken precautionary measures before he actually did.

The collision took place in the middle of the highway in front of the north extremity of a large area on the west side of the road known as Helton's Restaurant and Truck Stop. As the bus approached from the south a pickup truck in the service station area was pushing Queen's automobile in a northerly direction, parallel with the highway, in order to get it started. This effort was successful, and the car started. As it reached the end of the paved service station area it veered into the west lane of the highway, going north, then made a U-turn to the east shoulder of the highway, facing the oncoming bus, and cut back across the highway to get into the west or southbound lane. The bus driver, seeing Queen's automobile coming toward the bus on the wrong side of the road, turned the bus to the left, but apparently he did so at about the same moment Queen initiated his

diagonal move toward the southbound lane, and the two vehicles met in the center of the highway.

We shall not summarize the defensive testimony. Suffice it to say that it conflicts with but does not conclusively refute the evidence adduced by the Blankenships. We may therefore look to the sufficiency of their evidence to support the verdict.

The critical evidence consists of the testimony of the Blankenships and of the bus driver, the latter taken by pretrial deposition as if under cross-examination (cf. CR 26.03, 43.06), and is as follows:

### Mrs. Blankenship

Mrs. Blankenship was seated immediately behind the bus driver. She could not estimate the speed of the bus, but it "was going fast." Her attention to the road ahead was aroused by the exclamation of a fellow-passenger to the effect that a car was "coming out of the wrong side of the road." She looked at once and saw headlights "coming right at us" at a distance of "at least a city block." The bus driver immediately sounded his horns, "tapped the brake and just kept going." She could not tell that the bus slowed down any. The bus driver "swerved over into the left lane and just kept going," and the crash followed. She did not know the exact position of the bus with respect to the traffic lanes at the moment of the impact.

For impeachment purposes the defendants introduced a statement taken by an investigator for the bus company and signed by Mrs. Blankenship in the hospital several days after the accident. It was in the handwriting of the investigator, and Mrs. Blankenship testified that she did not remember anything about making or signing it. It recited that the Queen car "pulled out from the left side of the road came all the way across the highway into our traffic lane and cut south heading toward us. The driver of the Bus blew his horn * * and also slowed down some * * *. When he blew his horn the other car cut over to the Southbound lane. As we got closer to the Southbound car it cut sharply back into our traffic lane and hit us head on. The Bus driver didn't have time to do much at all. The distance was so short between the car and the Bus when the car came back at us the second time that the driver of the bus only had time to hit his brakes and sound his horn again. The Bus was in the Northbound traffic lane when the wreck happened * * *. The man driving the bus seemed like a good driver and did all he could to try and get out of the accident."

### Roger Lee Blankenship

Roger was sitting in a front seat across the aisle from his mother, next to the window. The bus was two hours late, and he heard the bus driver tell someone at Corbin that they would be in Cincinnati on time. As the bus approached the scene of the accident it was going about 60 m.p.h. The witness could not see the speedometer. His attention was attracted to the road ahead when the bus driver "tapped his brakes," at which time the witness looked up and saw the Queen automobile. It was in the north bound traffic lane "coming straight toward me" at a distance of about "a city block and a half, or about five hundred feet." When the bus driver tapped his brakes the bus did not slow down, but he swerved toward the left lane and was "astride the center line" when the collision occurred. When the witness first observed the Queen vehicle it "seemed to be a little bit on the shoulder" of the highway, and both its headlights were burning.

Roger Lee also had signed a statement for the investigator, which was duly introduced to impeach his testimony. Though he admitted having read and signed such a statement in his hospital room on the afternoon of July 11, 1965, he further testified as follows: "I signed a statement, but that's not the statement." According to the statement thus introduced, Roger was able to observe the speedometer of the bus and said it was traveling at a speed of 45

m.p.h. It was an hour late. The Queen car came out of the north end of the truck stop "straight across the road into the northbound traffic lane and headed south right toward us. When the bus driver saw what was happening, he put on his brakes and slowed down more, putting the bus into another gear. The bus driver cut to the left side of the road attempting to miss the oncoming car. When the bus driver cut to the left side, the car cut over there, too. The bus driver then cut back into the northbound traffic lane and so did the other car. The bus was completely in the northbound lane when the car came back the last time and hit our bus head on. The driver had hit his brakes hard trying to stop when the car came back in front of us. I don't have any idea of the distance we were from the car when he first came out and when he finally hit us, but the driver of the bus did everything he could to try to stay out of a wreck * * *. I was up front where I could see and I saw this older model car hit us head on while the bus was in the northbound traffic lane after we had tried to get out of the way. I think one of the headlights was out on the car."

### James D. Wallace (bus driver)

Wallace was an emergency driver operating a second section, the first or regularly scheduled bus having been filled to capacity. Roger Lee Blankenship was sitting in a front seat next to the aisle (not by the window), was very much interested in the operation of the bus and was talking to Wallace "practically from the time he got on the bus." As the bus approached the scene of the accident its speed was about 50 m.p.h. Wallace first noticed the Queen automobile while it was being pushed by a pickup truck northwardly through the service station area. At this point he did not take any precautionary measures, because "when I first saw them pushing it on the lot, of course, I was of no particular concern because it wasn't in any danger to me or the bus or my passengers." The bus was then 100 to 125 yards (300 to 375 feet) south of the point in the service station area where the car was being pushed, and the car was 100 feet off the west side of the highway pavement. After the car got started "he just cut sharp to his right toward the highway and then turned slightly back to the left as though he were going north at which time I considered it a concern and a danger to the safety of the bus." Wallace first applied his brakes and began to reduce the speed of the bus when Queen "turned and came toward the highway as though he would possibly enter the highway * * *. I was braking to try to be prepared if he did pull out * * * from all indications it appeared that he was going to try it." As Queen came onto the paved surface of the highway and headed north Wallace "started braking harder because my speed was probably twice that of his." Wallace estimated that when the Queen automobile entered upon the paved surface of the highway the distance between it and the bus was about 75 yards (225 feet). Queen was going 15 to 20 m.p.h. and moved a "very short distance * * * not over 20 yards" northward in the west or southbound traffic lane, then swerved onto the west shoulder of the highway and cut back sharply to the right, crossed the road and came down the east shoulder a distance of 10 to 15 yards, increased speed and cut back across to the west or southbound lane when about 10 yards in front of the bus, and then tried to return to the east or northbound lane when Wallace sought to avoid him by swerving to his own left into the southbound lane. Wallace, however, upon observing Queen's move toward the southbound lane, cut back to his right, and as the time for this shifting back and forth ran out the two vehicles collided in the center of the highway, a short distance south of the point at which Queen had first entered it. According to Wallace the bus was moving about 40 m.p.h. and was 40 to 50 yards away when Queen began his U-turn. He said Queen's headlights were not burning but that he could see his car all the time and

this circumstance had nothing to do with the accident.

■ From the testimony of Wallace the jury could believe that when Queen entered the highway the bus was 225 feet away and that Queen moved northward 60 feet on the left side of the road before making his U-turn and then came southward on the other side. Though Wallace says he began decreasing his speed before Queen came onto the highway, and had reduced it to 40 m.p.h. by the time Queen began his U-turn, the jury could choose to believe from the testimony of the Blankenships that he did not apply his brakes until Queen had completed the U-turn and that then he merely "tapped" the brakes instead of attempting to stop the bus as quickly as possible. It could also believe from their testimony that the distance between the two vehicles at the time the U-turn was executed was far greater than Wallace's estimate. Accepting the Blankenship testimony, it was not out of reason to conclude that in the exercise of the highest degree of caution Wallace should have attempted to stop sooner than he did, and that if he had done so the accident would have been avoided. Under the evidence we think the trial court properly submitted the case to the jury. The instructions included the defense of sudden emergency.

The appellants rely principally on the line of cases in which it has been held that the negligence of a motorist entering a superior highway in the face of a vehicle approaching so closely as to constitute an immediate hazard was the sole proximate cause of an ensuing collision. See, for example, Brumbach v. Day, Ky., 260 S.W.2d 939 (1953); Chambliss v. Lewis, Ky., 382 S.W.2d 207 (1964); Riggs v. Miller, Ky., 396 S.W.2d 69 (1965); Couch v. Hensley, Ky., 305 S.W.2d 765 (1957); Vaughn v. Jones, Ky., 257 S.W.2d 583 (1953). They also invoke the familiar rule that if the evidence is equally consistent with negligence and non-negligence the defendant is entitled to a directed verdict. Cf. Roberts v. General Industries, Inc., Ky., 320 S.W.

2d 619, 622 (1959). We need not cite all the cases to which the briefs refer, nor analyze or attempt to distinguish them separately. There are two distinguishing factors that apply in this case. One is that none of those cases involved the higher degree of care exacted of a carrier for hire. A carrier bears a "double standard" of care as between passengers and highway traffic. Roland v. Beckham, Ky., 408 S. W.2d 628, 634 (1966). To the passengers it owes "the utmost skill and foresight." Cf. Louisville & N. R. Co. v. Mitchell, 162 Ky. 253, 172 S.W. 527, 529 (1915). The other distinction is that those cases do not represent fact situations in which this court felt that a jury could reasonably have found that in the exercise of reasonable care the driver with the right-of-way could have avoided the accident after observing the negligent course of action being taken by the other driver. The latter type of situation is exemplified by such cases as Metcalfe v. Hopper, Ky., 400 S. W.2d 531, 534 (1966); Webb Transfer Lines, Inc., v. Taylor, Ky., 439 S.W.2d 88 (decided Nov. 1, 1968); and Browning v. Callison, Ky., 437 S.W.2d 941 (decided February 21, 1969). See also Adams v. Louisville Taxicab & Transfer Co., 307 Ky. 405, 211 S.W.2d 397 (1948), *supra*, in which a taxicab collided with another vehicle at an intersection and it was held that the cab driver's having the right-of-way would not preclude a finding that he was nevertheless concurrently negligent with respect to his passenger. 211 S.W.2d at p. 398. The *Brumbach* and *Couch* cases actually are not in point, because they merely held that the intruding driver (as, in this case, Queen) was negligent as a matter of law.

■ The impeaching quality of the pretrial statements signed by the Blankenships certainly was enough to raise a question as to the credibility of their testimony, but not to destroy it. The circumstances were such that it would not have been unreasonable for the jury to believe that the testimony given at the trial was the more trustworthy. There is, for example, the

fact that the statements were taken by and in the handwriting of an investigator employed by the defendants. They were taken while the Blankenships were in the hospital. They contain statements that do not consist with the facts as given by any of the principal witnesses, including the bus driver—for example (1) "The bus was in the Northbound traffic lane when the wreck happened:" (2) the Queen car came *"straight across the road into the northbound traffic lane* and headed south right toward us" (emphasis ours); and when the bus driver slowed down he put the bus into another gear. From these straws in the wind the jury may have suspected, with some justification, that the statements were written more to fit the investigator's conception of the accident than that of the Blankenships. All in all, they were for the jury to assess in weighing the testimony sought to be impeached.

The case was tried before it was decided in Jett v. Commonwealth, Ky., 436 S.W.2d 788 (1969), that out-of-court statements by witnesses need not be limited to impeachment purposes. However, it is our opinion that it could not have made any difference if the Blankenship statements had been treated as substantive evidence.

 The argument that the award of $55,000 to Mrs. Blankenship was excessive is not presented with much force or persuasion. She was 46 years old at the time of the accident, had been a seamstress for 34 years, and was employed by a shirt factory at an average weekly wage of $65. Her various injuries included, according to her physician, a compression fracture of the 12th dorsal vertebra. At the time of the trial, 20 months after the accident, she was still suffering back pain, could not sit up for more than a few minutes at a time, could not do her housework, and was wearing a back brace. She spent 12 days in the hospital, two more months in bed, and was in a plaster cast from the date of the accident on July 11 until the end of August. Her medical expenses amounted to $2,094 and her lost wages to the date of trial totalled

$5,460. Her doctor testified that "she is totally and permanently disabled because she cannot bend or lift and * * * she is not educated for anything other than what she has been accustomed to doing and, therefore, she is not able to do anything else." On this evidence we cannot say the award was excessive.

The judgment is affirmed.

HILL, MILLIKEN, REED and STEINFELD, JJ., concur.